Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the order, the Full Commission affirms and adopts the Decision and Order of the Deputy Commissioner with minor modifications as follows.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and Order as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Commission has jurisdiction of the parties and of the subject matter. This action was brought pursuant to the North Carolina Tort Claims Act, Article 31, Chapter 143 of the North Carolina General Statutes.
2. All parties have been correctly designated and there is no question of misjoinder or nonjoinder of the parties.
3. At all times concerned in these actions, Dr. Paul Phibbs, Anne Jenkins, Elizabeth Whitley, Carolyn Stocks, Jim Midgette, Edgar Bass, James L. Smith and Richard Brown were acting within the scope of their employment as employees and agents of East Carolina University, an institution of the State of North Carolina.
4. East Carolina University is an institution of the State of North Carolina as described under the Tort Clams Act for all purposes related to these actions and the tort claims by Elaine Georgalis and her husband, Nicholas Georgalis.
***********
The Full Commission adopts the findings of fact of the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. At the time of the trial, Ms. Georgalis was forty-two years old. She had been married to Mr. Georgalis for twenty-one years and the couple resided in Greenville, North Carolina. Ms. Georgalis has a bachelor's degree and a master's degree in nutrition from East Carolina University. Her employment history includes one year of work for a local school system, two years as a caterer/cafeteria manager, four years as a sales representative, and six years in defendant's department of environmental health. She was also employed as the nutrition wellness coordinator for the Pitt County Health Department.
2. In November 1989, Ms. Georgalis began working for defendant as a research technician in a microbiology laboratory. Dr. Paul Fletcher was Ms. Georgalis' immediate supervisor, and Dr. Paul Phibbs was the Chairman of the department of microbiology and immunology at the East Carolina School of Medicine. Mr. Georgalis was employed by defendant as a professor in the department of philosophy.
3. In 1990, Ms. Georgalis was diagnosed as having fibromyalgia and a bulging cervical disc at C5-C6. In June 1990, she was prescribed a course of physical therapy as treatment for her cervical condition. As a result of her medical condition, Ms. Georgalis decided to seek a reduction of her scheduled work hours. She submitted a written request for reduced work hours to Dr. Fletcher, stating in part that she was making the request "[d]ue to my past and present health problem, the stress and frustration it has caused and the amount of time that medical care and therapy is requiring . . ." She requested that her hours be reduced eight hours per week and that the hours be taken in four hour blocks, two afternoons per week. She requested that the reduction be effective for a minimum period of nine months. Dr. Fletcher forwarded the written request to Dr. Phibbs who possessed the authority to approve or disapprove of her request.
4. Dr. Phibbs met with Ms. Georgalis on 13 August 1990 to discuss her request. After an initial exchange, Dr. Phibbs asked Ms. Georgalis if she was experiencing stress caused by Dr. Fletcher or anything that was occurring in his laboratory. He asked her how many physicians she was seeing, whether one was a psychiatrist and why she was requesting a reduction in hours for nine month rather than six months. He also asked whether she was being treated for depression. Ms. Georgalis responded that she was seeing three physicians, one of whom was a psychiatrist who was treating her for depression and that she was requesting a work reduction for nine months because her doctor had told her she would need six to eight months of therapy. Dr. Phibbs informed Ms. Georgalis that he would require letters from each of her three physicians; however, when he was informed that one of the physicians was an obstetrician, he stated that he would only require letters from her psychiatrist and the other physician. He stated that after he received those letters he would consider allowing her a work reduction of six months in duration.
5. Ms. Georgalis believed that it was unreasonable for Dr. Phibbs to request two letters because she had previously been informed by an employee in defendant's personnel office that she would only need to make a written request for a work reduction before her request could be considered. During her conversation with Dr. Phibbs on 13 August 1990, Dr. Phibbs learned that she had consulted with defendant's personnel office about her request prior to presenting her request to Dr. Fletcher. Dr. Phibbs told Ms. Georgalis that in the future she should consult him about personnel matters, not the personnel office. Ms. Georgalis then began crying. Dr. Phibbs asked her why she was crying and stated that she should just obtain the two letters from her physicians. Ms. Georgalis did not discuss her medical condition with other people and did not believe that Dr. Phibbs had a right to ask her about her medical condition.
6. Ms. Georgalis consulted again with defendant's personnel office and was informed that if she made a request for a work reduction and her physician agreed in writing that she needed a reduction, defendant should be able to comply with her request. Ms. Georgalis obtained a note from her treating physician, Dr. Shuping, which stated, "Ms. Georgalis should have reduced work load to 30-32 hrs." Ms. Georgalis presented the note to Dr. Phibbs' secretary, Ms. Atkinson, who informed Ms. Georgalis that Dr. Phibbs would deem the note insufficient to grant her request. Ms. Georgalis asked Ms. Atkinson for documentation regarding the requirements for obtaining reduced work hours. Ms. Atkinson telephoned personnel director Edgar Bass and made an appointment for Ms. Georgalis to meet with him. Ms. Georgalis, Ms. Atkinson and Mr. Bass met in Mr. Bass' office. Mr. Bass informed Ms. Georgalis that there was no documentation regarding work reductions, that Dr. Phibbs was the decision maker for such a request, and that unless Dr. Phibbs' requirements were met the request for reduced hours would not be granted. Ms. Georgalis believed that Dr. Phibbs' requirements were unreasonable and that she was being manipulated and scrutinized.
7. Thereafter, Ms. Georgalis wrote a letter to Dr. Phibbs asking him to review the prescription pad note from Dr. Shuping, to inform her whether the note would be sufficient, and if not, to specifically state what would be necessary to receive the requested work reduction. Ms. Georgalis, accompanied by Lilly Fainter, hand delivered the letter and prescription pad note to Dr. Phibbs in his office on 23 August 1990. Although she believed that Dr. Phibbs "flew off the wall" due to Ms. Fainter's presence, Ms. Georgalis was very comfortable during her meeting with Dr. Phibbs on that date.
8. By letter dated 27 August 1990, Dr. Phibbs informed Ms. Georgalis that he would require a letter of explanation from her attending physician to document her medical need for alterations in her normal work schedule. He enclosed a copy of her job description and a medical records release authorization. Thereafter, Dr. Shuping wrote a letter on behalf of Ms. Georgalis which she delivered to Dr. Phibbs by inter-office mail. Dr. Phibbs then granted Ms. Georgalis the reduction of work hours she had requested. She began working thirty-two hours per week in September 1990.
9. At all times during his interaction with Ms. Georgalis regarding her request for work reduction, Dr. Phibbs' acted within the scope of his duties as Chairman of the department of microbiology and immunology.
10. In obtaining a reduction of her work hours in 1990, Ms. Georgalis did not provide defendant's employees with medical records, letters or any other documentation from Dr. Evans, her psychiatrist.
11. Beginning 1 July 1991, Ms. Georgalis returned to full-time employment in Dr. Fletcher's microbiology lab. She continued to be so employed through the fall of 1993, when she again sought a reduction of her work hours. She first made this request orally to Mr. Jim Midgette on 27 September 1993, stating that she was having recurrent fibromyalgia and sleep disturbance. She requested that her work hours be reduced to 25 to 30 hours per week, or in the alternative, that she be transferred to another position that would allow her to work that number of hours per week. By letter dated 30 September 1993, Ms. Georgalis confirmed this conversation. Copies of this letter were sent to Drs. Fletcher and Phibbs. The letter did not state or other wise indicate that she was seeking reduced work hours as a result of any emotional or psychiatric condition.
12. When Ms. Georgalis received no response from Mr. Midgette between 27 September 1993 and 9 February 1994, she decided to ask Dr. Phibbs directly to approve a reduction of her work hours. She obtained a letter from her psychiatrist, Dr. Evans, dated 4 February 1994 which stated that she was having difficulty functioning at full capacity due an adjustment to medication and that she should work for only 25 to 30 hours per week. She wrote a letter to Dr. Phibbs dated 5 February 1994, asking for a reduction of her work hours due to "an earlier unresolved medical condition (Fall 1990)[.]" Ms. Georgalis hand delivered these letters, and her 30 September 1993 letter to Mr. Midgette, to Dr. Phibbs on 9 February 1994.
13. When Ms. Georgalis presented the letters and her request for reduced work hours to Dr. Phibbs he stated, "I can't take this. I won't take this. I won't approve something like this every time you come in here and want something like this." Ms. Georgalis felt intimidated and did not know what to say. She explained that it was not her desire to work fewer hours, but that it was a medical necessity. Dr. Phibbs replied that she was hired to work full-time and that is what he expected her to do. Ms. Georgalis stated that as a result of her request for reduced hours in 1990, she believed that the letters she had written to Mr. Midgette, Dr. Phibbs and the letter from Dr. Evans would be sufficient to obtain the work reduction she was requesting. Dr. Phibbs responded that what she needed was his approval of the request and that without his approval she would not be permitted to work a reduced number of hours. At that point, Ms. Georgalis began crying and she felt "intimidated", "helpless" and "hopeless."
14. When she began to leave Dr. Phibbs' office, Dr. Phibbs instructed her to sit down. He asked her why everyone in Dr. Fletcher's lab was always causing him trouble, always stabbing him in the back. Ms. Georgalis stated that it was not her intent to cause trouble, she believed she had followed proper procedures in making her request and Dr. Fletcher did not think her request would create a problem. Dr. Phibbs responded that Dr. Fletcher did not know what he was talking about, he was irresponsible, he did not know how to run a lab, his entire lab was irresponsible. He noted that Ms. Georgalis and her husband had chosen not to attend his Christmas party, which caused him to unnecessarily incur costs of $30.00. He also stated that she was irresponsible because she was unable to work. Dr. Phibbs stated that Dr. Fletcher should not have hired Ms. Georgalis and that he should have known that she could not handle the position. Ms. Georgalis responded by saying that she did not want to be involved in disputes or differences that existed between Drs. Phibbs and Fletcher. Dr. Phibbs then asked Ms. Georgalis what conflict between himself and Fletcher she was referring to. Ms. Georgalis explained what Dr. Fletcher had told his staff about events that had occurred between himself and Dr. Phibbs. After Ms. Georgalis told Dr. Phibbs what Dr. Fletcher had said about him, Dr. Phibbs became angry and voiced his anger toward Dr. Fletcher to Ms. Georgalis.
15. As Ms. Georgalis continued to cry, Dr. Phibbs called Ms. Lewis, his secretary, into his office and asked Ms. Georgalis to repeat for Ms. Lewis what she had told him. Ms. Georgalis told Ms. Lewis that she had fibromyalgia and sleep disturbance for which she requested a work reduction from Mr. Midgette. Dr. Phibbs then asked Ms. Georgalis to tell Ms. Lewis about the problems in Dr. Fletcher's lab and the reason she did not go to Dr. Phibbs' Christmas party. He next asked her to tell Ms. Lewis why she was upset. Ms. Georgalis responded that it was not possible for her to explain why she was upset, that Ms. Lewis could not understand why she was upset because she did not know what had happened in the past and could not know how the feelings that Ms. Georgalis had in 1990 had come back to her. Continuing to cry, Ms. Georgalis handed the three letters to Ms. Lewis and left Dr. Phibbs' office. She returned briefly to the laboratory before going to her car and driving a very short distance to the office of Dr. Evans.
16. During this meeting, Dr. Phibbs spoke to Ms. Georgalis in a stern, matter-of-fact manner. He spoke to her loudly and authoritatively, but he did not yell at her. Further, Dr. Phibbs acted within the scope of his authority in this matter with Ms. Georgalis.
17. On 9 February 1994, Ms. Georgalis was under the care of Dr. Evans for depression. Dr. Evans first treated Ms. Georgalis in 1989. At that time, Ms. Georgalis had major depression which Dr. Evans treated with medications. Dr. Evans continued treating Ms. Georgalis on a regular basis through October 1990. At that time, Ms. Georgalis made no additional appointments with Dr. Evans until June 1991. In June 1991, Ms. Georgalis had become angry, confused and depressed after learning that a psychologist from whom she had been receiving therapy would be leaving his practice. From 1991 through 9 February 1994, Dr. Evans routinely treated Ms. Georgalis for depression, however, her depression during that time was not severe. Dr. Evans treated her depression with medications.
18. When Ms. Georgalis presented to Dr. Evans on 9 February 1994, she was experiencing severe emotional distress. Ms. Georgalis' severe emotional distress was caused, at least in part, by the incident in Dr. Phibbs' office on that date. Thereafter, Dr. Evans continued treating Ms. Georgalis for depression, anxiety and sleep disturbance.
19. After 9 February 1994, Ms. Georgalis first returned to work on 11 April 1994. During the period of time that she was out of work, Ms. Georgalis was given family medical leave. Under the family medical leave plan, she was entitled to have defendant continue paying her health insurance premiums for up to twelve weeks. While she was out of work, defendant began paying her health insurance premiums under its family medical leave plan. These payments continued through 4 April 1994.
20. Ms. Georgalis returned to work on 11 April 1994, working twenty hours per week. In addition to her wages, Ms. Georgalis received short term disability payments. As a part-time employee, she was no longer eligible to have her health insurance premiums paid by defendant. In March 1994, Ms. Whitley, employed in defendant's human resources office, informed Ms. Georgalis that it would be her responsibility to make the premium payments. Ms. Whitley advised Ms. Georgalis that she could obtain insurance coverage independently of the university's plan, and they discussed whether it would be advantageous for Mr. Georgalis to add Ms. Georgalis as an insured under his policy. Ms. Whitley informed Ms. Georgalis that she would attempt to determine the most advantageous method for Ms. Georgalis to continue having health insurance coverage.
21. Ms. Carolyn Stocks is an employee in defendant's human resources department. Ms. Stocks telephoned Ms. Georgalis in June 1994, informed her that she owed health insurance premiums back to the date her family medical leave coverage expired, and asked whether she wanted these premium payments deducted from her salary or her short term disability payments. She informed Ms. Georgalis that she did not know whether it would be preferable to have the payments deducted from one source rather than the other. Ms. Georgalis responded that if it did not make any difference, the payments could be deducted from either source. As a result of Ms. Stocks' call, Ms. Georgalis believed that she had a health insurance policy in effect. Believing that the matter would be handled by the university, Ms. Georgalis never told Ms. Stocks from which source she wanted the payments deducted.
22. Ms. Georgalis did have health insurance coverage in effect through November 1994 because defendant failed to stop paying Ms. Georgalis' health insurance after her family medical leave coverage expired on 4 April 1994. In November 1994, Ms. Whitley discovered the error and telephoned Ms. Georgalis. Ms. Whitley informed Ms. Georgalis that she would be responsible for reimbursing defendant for the erroneous payments and suggested that the payments could be made on an installment basis. She also explained that if Ms. Georgalis did not reimburse defendant for the payments, her health insurance would be retroactively canceled. Ms. Georgalis informed Ms. Whitley that she did not intend to reimburse defendant for the premium payments it had made since June 1994. Understanding the gravity of Ms. Georgalis' decision, Ms. Whitley asked Ms. Stocks to telephone Ms. Georgalis' and confirm that she intended to cancel her health insurance coverage. Ms. Stocks telephoned Ms. Georgalis' as directed and confirmed her intent to cancel her coverage. At this time, Ms. Georgalis was competent to make decisions relating to her health and financial welfare.
23. On 20 December 1994, Ms. Whitley wrote to a state health insurance plan administrator and explained the error that defendant had made by paying Ms. Georgalis' health insurance premium after June 1994. She also informed the administrator that Ms. Georgalis had canceled her coverage by declining to make the insurance premium payments.
24. In February 1995, Mr. Georgalis received an explanation of insurance benefits form in the mail which indicated that Ms. Georgalis' health insurance carrier was denying coverage for treatment being provided by Dr. Evans. Thereafter, the insurance carrier informed Mr. Georgalis' that Ms. Georgalis' health insurance coverage had been canceled effective 1 June 1994. Upon receiving this information, Mr. Georgalis met with Ann Jenkins about the cancellation of Ms. Georgalis' health insurance coverage. Ms. Jenkins informed Mr. Georgalis that there were some handwritten notes indicating that Ms. Georgalis had canceled her insurance, but that she could not rely on those notes and she would do whatever was necessary to have Ms. Georgalis' health insurance coverage reinstated retroactively. She further informed Mr. Georgalis that the likelihood of obtaining a retroactive reinstatement of Ms. Georgalis' health insurance would be greatest if the defendant informed the carrier that it should not have accepted Ms. Georgalis' cancellation of the policy due to her psychological condition. Mr. Georgalis did not believe that Ms. Georgalis had canceled her insurance, and on that basis objected to Ms. Jenkins' strategy for obtaining reinstatement of Ms. Georgalis' health insurance coverage.
25. Ms. Georgalis learned that her insurance had been canceled in late March 1995 when she observed certain paperwork in Dr. Evans' office which indicated that the insurer was denying payment of bills Ms. Georgalis incurred for treatment from Dr. Evans. When Ms. Georgalis told Mr. Georgalis about her discovery, he confirmed that her policy had in fact been canceled and that he had been told by defendant's employees that it was canceled at Ms. Georgalis' request.
26. On 13 March 1995, Ms. Whitley wrote to the health insurance plan administrator asking that Ms. Georgalis' health insurance coverage be reinstated retroactively to 1 June 1994. In her letter Ms. Whitley stated that Ms. Georgalis' condition may have rendered her incapable of making correct decisions for her own care. By a similarly worded letter dated 28 March 1995, Ms. Whitley again requested retroactive reinstatement of Ms. Georgalis' insurance coverage. By letter dated 3 April 1995, the plan administrator denied the request. Ms. Jenkins informed Mr. Georgalis of the denial on or about 5 April 1995. She further informed him that he and Ms. Georgalis would be responsible for pursuing the matter further. The same day, Mr. Georgalis informed Ms. Georgalis that the request had been denied. Upon learning of the denial, Ms. Georgalis became "paranoid". She believed that defendant's employees were attempting to destroy her. She did not want to live. She did not believe that she deserved to live. She believed she was being manipulated and that her condition was never going to improve. The following day, Ms. Georgalis was again hospitalized due severe emotional distress. Her emotional distress was caused by her learning of the cancellation of her health insurance and that she and her husband would be responsible for making any additional efforts to obtain retroactive reinstatement of her coverage. This hospitalization lasted one week.
27. On 7 April 1995, Mr. Georgalis wrote a letter for Ms. Georgalis' signature appealing the insurance carrier's denial of her request for reinstatement of her health insurance coverage. In her letter, she stated that until March 1995, she believed that had health insurance coverage and that defendant was deducting the premium payments from her disability payments. She stated that she never canceled her insurance and that defendant's cancellation of her coverage without her consent or knowledge was reckless. She stated that allowing cancellation of health insurance without the signature of the insured was negligent.
28. Ordinarily, changes in defendant's employees' health insurance coverage, including cancellations, were to be made on a state health plan change form. These forms included a signature line for the covered employee to sign, thereby authorizing the designated change. Change forms were not required, nor were they used to cancel coverage when the reason for the cancellation was non-payment of the required premium.
29. On 6 April 1995, Mr. Georgalis contacted Mr. James Leroy Smith, executive assistant to the chancellor of the university. Mr. Georgalis informed Mr. Smith about the cancellation of Ms. Georgalis' insurance coverage. In response, Mr. Smith met with Ms. Jenkins, who again suggested that the best strategy for obtaining reinstatement of Ms. Georgalis' coverage was to state that the university should not have accepted Ms. Georgalis' cancellation of the policy due to her psychological condition.
30. At the request of Mr. Smith, Vice Chancellor Richard Brown telephoned Mr. Georgalis on or about 10 April 1995. Mr. Brown informed Mr. Georgalis he was aware of the administrative error and stated that the university was doing all that it could to have Ms. Georgalis' coverage reinstated. On 28 April 1995, Mr. Georgalis met with Chancellor Aiken and explained the series of events leading to Ms. Georgalis' hospitalizations and the cancellation of her insurance. On 2 May 1995, Mr. Brown wrote Mr. DeVries, the executive director of the health plan, and explained the circumstances regarding the cancellation of Ms. Georgalis' health insurance. In his letter he stated that it was reasonable to conclude that Ms. Georgalis may not have fully understood the consequences of the choices that were presented to her. As a result of this letter, Ms. Georgalis' health insurance coverage was retroactively reinstated to June 1994. Ms. Georgalis' health insurance was reinstated based upon defendant's assertion that the cancellation occurred as a result of an administrative error.
31. Ms. Stocks and Ms. Whitley acted reasonably at all times in providing Ms. Georgalis with information about her eligibility for the various benefits she was entitled to receive as an employee of defendant, including the means available to her for continuing her health insurance coverage. Ms. Stocks and Ms. Whitley acted reasonably when they informed Ms. Georgalis that as a part-time employee she would be responsible for paying her health insurance. They acted reasonably when they informed Ms. Georgalis that defendant had erroneously continued paying her health insurance premiums through November 1994, she would be responsible for reimbursing defendant for those premiums and failure to reimburse defendant would result in the cancellation of her health insurance policy. Ms. Whitley and Ms. Stocks acted reasonably when they effected the cancellation of her health insurance policy after orally determining that Ms. Georgalis did not intend to reimburse defendant for its erroneous payment of her premiums after April 1994. Further, there is no evidence to demonstrate any foreseeability on the part of said employees regarding the consequences of their actions on Ms. Georgalis' emotional state.
32. After her hospitalization in April 1995, Ms. Georgalis first returned to work in August 1995. Ms. Georgalis continued working twenty hours per week until October 1995, when she again excused from work as a result of her emotional condition.
33. Since April 1994, Ms. Georgalis believed that she had five years of creditable service in the state retirement system and that she would be entitled to receive long term disability benefits if her disability continued after the expiration of her eligibility for short term disability benefits. Although Ms. Georgalis did not have five years of creditable service from her employment with defendant, by transferring her local government service to the state system and adding that credit to her state credit, she was eligible for long term disability benefits. Ms. Georgalis applied to have her local government credit transferred to the state system on or about 15 March 1994.
34. Ms. Georgalis continued receiving short term disability benefits from defendant through 4 April 1995. At that time, the State Disability Plan extended her short term disability benefits through 11 November 1995. On 27 April 1995, Ms. Whitley confirmed to Mr. Bass that Ms. Georgalis was eligible for these short term disability benefits. However, in the same letter Ms. Whitley stated that Ms. Georgalis was not eligible for long term disability benefits. At some time prior to 3 November 1995, the State Disability Plan extended Ms. Georgalis' short term disability benefits through 31 March 1996.
35. By letter dated 13 November 1995, Ms. Jenkins advised Ms. Georgalis that her short term disability benefits had been extended through 31 March 1996, she was not eligible for long term disability benefits and she must submit her resignation if she was unable to return to work on 1 April 1996. When Ms. Georgalis received this letter, Mr. Georgalis telephoned the state retirement system and received confirmation that Ms. Georgalis was eligible for long term disability benefits. By letter dated 21 November 1995, the state retirement system gave Ms. Georgalis written confirmation of her eligibility for long term disability.
36. On 30 November 1995, Ms. Jenkins wrote another letter to Ms. Georgalis explaining her eligibility for various benefits. She again advised Ms. Georgalis that she was not eligible for long term disability benefits and would have to return to work or resign on 1 April 1996. On the same date, Mr. Georgalis wrote a letter to Mr. Brown in which he stated that the November 13 letter from Ms. Jenkins sent Ms. Georgalis into deep depression and caused her to become very upset. He further stated that Ms. Jenkins' statement that Ms. Georgalis was not eligible for long term disability benefits was false and Ms. Jenkins would have known her statement was false if she had acted reasonably and responsibly.
37. The state long term disability plan is not administered by defendant. When Ms. Jenkins wrote the letters to Ms. Georgalis in November 1995, the records defendant possessed concerning Ms. Georgalis' employment did not reflect that she had five of more years of creditable service. The only employment records defendant possessed were Ms. Georgalis' employment records from defendant. Defendant did not possess Ms. Georgalis' local government employment records.
38. The error on the part of defendant in misinforming Ms. Georgalis was reasonable in light of the employment records in defendant's possession. Even assuming that Ms. Jenkins reliance on those employment records was unreasonable, it was not reasonably foreseeable that these erroneous statements would cause emotional injury to Ms. Georgalis.
39. Ms. Georgalis returned to work part-time on 22 January 1996. She continued working on a part time basis through her last day of work for defendant on 15 April 1996. As of August 1997, she had not returned to work for defendant. Likewise, she had not worked for any other employer. She was receiving long term disability benefits during the period that she was out of work.
40. At the time of Dr. Phibbs' and Ms. Georgalis' meeting on 9 February 1994, Dr. Phibbs knew, or reasonably should have known that in 1990 Ms. Georgalis was under the care of Dr. Shuping for symptoms caused by fibromyalgia and a bulging disc at C5-C6. He knew or reasonably should have known that in 1990 Ms. Georgalis was under the care of a psychiatrist who was treating her with medications for depression. However, at the time of his meeting with Ms. Georgalis on 14 February 1994, Dr. Phibbs had no basis upon which to conclude that she was still suffering depression, or that a discussion regarding her need for a reduced work schedule would result in severe emotional harm to her.
***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. To establish actionable negligence, a plaintiff must show some failure to exercise proper care in the performance of some legal duty which defendant owed to plaintiff under the circumstances in which they were placed and that the breach of duty was a proximate cause of the injury. Hairston v.Alexander Tank Equipment Co., 310 N.C. 227, 311 S.E.2d 558
(1984). Proximate cause is a cause which in natural and continuous sequence produced the plaintiff's injury, without which the injury would not have occurred and one from which a person of ordinary prudence could have reasonably foreseen that consequences of an injurious nature would result under all the facts as they existed. Id. Foreseeability is a requisite of proximate cause. Nance v. Parks, 266 N.C. 206,146 S.E.2d 24 (1966).
2. The damages sustained by Elaine Georgalis and Nicholas Georgalis were not caused by negligence on the part of defendant's named employees, nor was the emotional injury of Ms. Georgalis resulting from the actions of defendant's named employees foreseeable.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiffs' claims must be, and the same are hereby, DISMISSED WITH PREJUDICE.
2. Each party shall bear its own costs.
This the ___ day of March, 1999.
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ RENEE C. RIGGSBEE COMMISSIONER
S/_____________ CHRISTOPHER SCOTT COMMISSIONER
BSB/jbd